KIMBALL et al. v. WATERS METAL CONST. CO. et al.

(Circuit Court. D. Minnesota, Fourth Division. March 8, 1910.)

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—HEATING APPARATUS:
    The Smith patent, No. 665,351, for a heating apparatus having an auxiliary flue for ventilating purposes, claims 5 and 6, construed, and *held* not anticipated, valid, and infringed.

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—HEATING APPARATUS.
    The Smith patent, No. 868,299, for a heating and ventilating system, construed, and *held* not anticipated, valid, and infringed by one device made and sold by defendants, but not infringed by others.

In Equity. Suit by Clement F. Kimball, trustee, C. H. Smith, Alta Smith, and Harry L. Smith, against the Waters Metal Construction Company, a firm, and James L. Waterbury. On final hearing. Decree for complainants.

Clement F. Kimball and Williamson & Merchant, for complainants.

Paul & Paul, for defendants.

WILLARD, District Judge. The First Patent to Smith, No. 665,-351, January 1, 1901. Claim 5 of this patent is as follows:

"In a heating apparatus, the combination with a heater, of a main flue, an auxiliary flue having a capacity substantially that of the main flue, and having a portion extending transverse to and at an angle into the main flue and a smoke-flue entering the transverse portion of the auxiliary flue, substantially as described."

Construing this claim by itself, without reference either to the specification or the drawings, it seems clear that the language thereof does not require a structure with two elbows or bends, and that an auxiliary flue leading vertically from the floor and turning at a right angle into the chimney would be described by this claim.

McInerney, the complainants' expert, testified as follows:

"XQ. Now, you are very certain that the expression in claim 5, 'having a portion extending transverse to and at an angle into the main flue,' was not intended to limit the structure to the transverse part 7, and the part 8, at an angle from that, going into the main flue? You are clear as to that, are you? A. That seems perfectly clear to me." Complainants' Record, vol. 1, p. 136.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Carter, the defendants' expert, speaking of figure 2, of the diagrams, said, on page 116, Defendants' Record:

"The 'portion extending transverse to and at an angle into the main flue' is this portion 7, already just mentioned which leads rearwardly into the chimney at 8, as I have stated."

Although this witness repeatedly testified that claims 5 and 6 required the horizontal part 7, yet in the extract above quoted it will be seen that he defines the clause "portion extending transverse to and at an angle into the main flue" in such a way as to require only one bend.

The claims must, however, of course, be construed with reference to the specification and to the drawings. As to the drawings, while it is true that figure 1 shows two bends, it is also true that figure 2 shows only one.

Defendants rely greatly on the language of the specification to so limit these claims as to require a double elbow. They refer particularly to that part of the specification commencing with line 41, on page 1, which reads as follows:

"I have discovered that by employing an auxiliary flue of a capacity substantially that of the chimney of main flue and that by so positioning and arranging a portion of the auxiliary flue that either a horizontal current, or a current not directed upward, of air will pass through the flue and be deflected into the chimney. * * *"

And to that part commencing with line 14, on page 2, which is as follows:

"And I have found that the best results are obtained when that portion of the air-flue into which the smoke-flue discharges is arranged in either a substantially horizontal position or a position not extending upward toward the exit, and my experience has shown that a flue extending upward with a single bend into the chimney. and into which the smoke-flue enters will not accomplish the same results, although I do not wish to be understood as limiting my invention to the particular construction of the elbow portion."

While it is true that the inventor, in the first part of the specification quoted, refers to "a horizontal current, or a current not directed upward," yet his attention was not called to the specific construction of the elbows until he reached the second quotation on page 2. There he took up the precise question which is now under discussion in this suit, namely, as to whether the structure should have one elbow or two.

The defendants in their brief say, on page 9, referring to this quotation:

"We understand this to mean that the patentee here refers to a structure with a single bend, such as is shown on the blueprint opposite page 6 of this brief."

Carter makes substantially the same statement on page 217 of defendants' record.

It will be observed that, in this part of the specification which the witness Carter calls a "disclaimer," the patentee does not say that the construction with one elbow will not accomplish any result. What he intended to say, and did in fact say, was that with the horizontal sec-

tion 7 better results would be accomplished. This simply means that the construction with section 7 was the preferred construction. That other constructions were not excluded is conclusively shown by the last part of the quotation, in which he says:

"I do not wish to be understood as limiting my invention to the particular construction of the elbow portion."

He says, also, on page 1, line 38, of the specification:

"I desire it understood that the invention is in no sense limited to the construction shown" in the accompanying drawings.

In order, however, to make the above reservation available, it was not only necessary that he should state it in the specification, but also that he should repeat it in the claims, and this is what he did when claims 5 and 6 were drafted. That the purpose of claims 5 and 6 was to preserve this reservation is made more apparent when the six other claims of the patent are considered; for it is said in every one of them that the horizontal portion 7 is an essential element. If the horizontal section 7 is an essential element in claims 5 and 6, it would be difficult to distinguish them from some of the other claims.

The defendants, however, say that when the claims are considered in connection with the file wrapper their construction of them must prevail.

Carter, in his testimony, on page 119, Defendants' Record, makes a quotation from the file wrapper, as follows:

"For instance, in the argument submitted under date of June 6, 1900, with reference to the then existing claim 1 of the application, I find this expression: 'Claim 1 is not met in patents cited, for they do not show means for supplying air to the main flue laterally across the exit of the smoke-flue and into the main flue in line with the smoke-flue.' 'Laterally' does not mean upwardly. No reference shows the cold air passing laterally across the exit of the smoke-flue. In Sears' the air is admitted directly to the main flue or chimney below the smoke-flue, and the current does not cross, but passes upwardly with the current from the smoke-flue. In the Fox device, the cold air is admitted directly to the smoke-pipe."

The examiner, however, was then considering, not those claims which afterwards became claims 5 and 6, but what was then claim 1, which reads, in part, as follows:

"And means for supplying air to the main flue laterally across the exit of the smoke-flue."

When the file wrapper is further considered, indications are found therein that the patentee did not then consider part 7 as an essential feature of his invention, for he says in his original specification, "for safety, to prevent the falling of sparks to the floor, I preferably provide the horizontal section 7 in the cold air pipe, in which section all sparks, etc., which would otherwise drop down the pipe, lodge temporarily." That he did not consider that the flow of the cold air current should be necessarily a lateral one is indicated in the communication of July 7, 1897, wherein he said:

"In his device he claims that the effect of bringing a large current of cold air in right angle conjunction with the current of hot air from the stove. * * *"

177 F.—16

It is true that the examiner in his communication of June 25, 1900, uses the word "across"; but the use of that word does not necessarily indicate that, if the volume of cold air had a right angle conjunction with the hot air from the smoke-flue, it would not meet the requirement of the examiner; and the fact that he afterwards allowed claims 5 and 6, which, as has been seen, when properly construed do not require a horizontal section, shows that a lateral action was not in his opinion essential.

Complainants also proved that they had in fact constructed devices with a single elbow, similar to the blueprint device in defendants' brief, with the exception that the ventilating flue extended upward instead of downward. One of such devices was put in the house of the witness Everington (Complainants' Record, vol. 1, pp. 331–339) in 1904 (Complainants' Record, vol. 1, p. 45).

Carter says (Defendants' Record, p. 155) that this device which he saw installed was similar to Exhibit 25, which is a printed circular used by complainants upon the back of their stationery, which circular has a cut showing a single elbow with the ventilating flue extending upwards.

Claim 6 provides for the same construction of the auxiliary flue as claim 5. McInerney, vol. 1, Complainants' Record, p. 136; Carter, Defendants' Record, p. 177.

Claims 5 and 6, therefore, must be construed as covering a structure with a single elbow, similar to the one upon the blueprint in defendants' brief.

Claims 5 and 6, being construed as above indicated, are they anticipated by any of the prior patents?

Before discussing this question, it is important to determine what the precise construction of the complainants' device is, under this interpretation of claims 5 and 6.

The suggestion by defendants that the smoke-pipe 6 may project into the ventilating flue is not supported by the evidence. The word "leading" in claim 6 does not indicate a projection into the auxiliary flue, any more than the same word used in the same claim indicates a projection of the auxiliary flue into the main flue or chimney. Nor does the word "entering" used in the fifth claim require the actual projection of the smoke-pipe into the part 7. This seems to be the opinion of the defendants' expert Carter, who, in discussing the difference between the Wickersham patent and the complainants' patent, says:

"Assuming therefore such a construction, in which the horizontal portion 7 is eliminated, and the dependent portion of the flue extends directly downward from the angle or elbow 8, it will be noted that this construction is precisely what the Wickersham patent shows, excepting in two matters of detail. The first of these matters of detail is that the Wickersham patent shows the flue I as extending a few inches into the foul air flue G where it enters the latter." Defendants' Record, p. 123.

On page 238 he points out again this difference between the Wickersham device and complainants' structure, stating in substance that

in the former the smoke-flue projects into the air-flue, while in the latter it does not.

It is conceded that no projection of the smoke-flue is shown in complainants' diagrams. Complainants' expert testified that the smoke-pipe was intended to stop at the line of the foul air flue. Complainants' Record, vol. 2, p. 201.

Nor is the defendants' suggestion that the smoke-pipe may be as large as or larger than the auxiliary flue sustained by the evidence. Both drawings show it to be considerably smaller, and it would seem to be absurd to make the smoke-pipe leading from the combustion chamber as large as the outside chimney. See, upon this point, the testimony of complainants' expert (volume 2, pp. 272, 273).

It is very evident that the patentee understood that his drawings called for a smoke-pipe considerably smaller than the foul air flue. This theory is supported by a reference to the file wrapper. In the patentee's communication of July 7, 1897, he says that the large cold air pipe is always arranged to form a connection with the small hot air pipe, and in the communication of July 28, 1899, he says that in the applicant's apparatus the air-pipe is of larger capacity than the smoke-pipe, and the smoke-pipe discharges into the air-pipe. In several of the claims which were presented from time to time this feature of the apparatus is pointed out.

We therefore have in the complainants' structure a smoke-pipe smaller than the air-flue, joining it, but not projecting into it, producing practically, as claimed by the complainants' expert, an enlarged chamber at the point of junction of the two flues.

The defendants have presented a great many prior patents; but no one of them shows a structure where the smoke-flue stops at the entrance of the air-flue, and where at the junction of these flues an enlarged chamber is produced by reason of the smoke-flue being smaller than the air-flue. It is admitted by the defendants' expert Carter that in the Wickersham patent there is a pipe projecting into the air-flue. Defendants' Record, pp. 123, 238.

It is apparently admitted also that in the Kosinski patent the small flue thus projects in all of the figures. Defendants' Record, pp. 164, 245. That the smoke-pipe in Fig. 4 in this patent is continued on beyond what is shown in the drawing is stated by both experts. Carter, Defendants' Record, p. 216; McInerney, Complainants' Record, vol. 2, p. 191. See, also, pp. 176, 190, 198.

While in the Maynard patent there is no projection of the smoke-flue, yet it appears from the drawing that the smoke-flue is larger than the cold air flue, and the patent itself states that:

"The cold air flue is graduated in size or made tapering in form, the smaller end entering the smoke-pipe, and the larger connecting with the room register. This is an important feature of the invention."

This device shows therefore no enlarged chamber such as is contemplated in the complainants' device.

The difference in the result produced by a structure with a projecting small flue and by a structure without one is that where the smoke-flue projects the currents of air from that flue flow in a parallel direction with the currents from the cold air flue; while, where

there is no projection, the two currents are mixed, and, as is claimed by complainants' expert, no stratification of air currents results. That this difference exists is admitted by defendants' expert on page 165 of Defendants' Record, where he says: "*   *   *" Also on'page 166 he says: "*   *   *" And again on page 167 he says: "*   *   *"

It is therefore proven that there is a difference between the complainants' patent and the prior devices, and it was precisely on account of this difference that the patent in this suit was granted.

The defendants' expert, however, states that no different result is produced by complainants' structure from that produced by the other structures. He says repeatedly that the complainants' device amounts to nothing more than an ordinary check draft. Defendants' Record, pp. 120, 164.

On the other hand, complainants' expert states that there is a great difference between the results produced by the different devices, and that this difference is due entirely to the fact that Smith brings his cold air current at a right angle conjunction with the hot air from the stove in an enlarged chamber, thus producing a mixing of the two currents into one volume of practically equal temperature. He says further (Complainants' Record, vol. 2, p. 198): "*   *   *" And again he says on page 203: "*   *   *" And again on page 207: "*   *   *" See, also, pp. 265, 270, 273.

If the case were to be decided upon the testimony of these two experts alone, disagreeing as they do, preference should be given to McInerney. It appears that Carter had had no practical experience in the matter of heating or ventilating apparatus. Defendants' Record, p. 199. On the other hand, complainants' expert had been engaged in the heating and ventilating business to quite a considerable extent. Complainants' Record, vol. 2, p. 152.

It is proper, moreover, to refer in this connection to the commercial success of complainants' device. The patentee Smith has apparently devoted his time to the business of manufacturing and selling his device since 1900. Complainants' Record, p. 67. The Manuel-Smith Heating Company has been engaged in the business exclusively since May, 1905, and since that time it has sold 2,518 systems, and of these 1,426 were sold between May 1, 1907, and May 1, 1908. Complainants' Record, vol. 1, p. 246. Over 95 per cent. of these have gone into school buildings. Complainants' Record, vol. 1, p. 262.

The State Superintendent of Public Instruction of Minnesota accepted the Smith device as a compliance with the state regulations for the ventilation of schools. Complainants' Record, vol. 1, p. 166. He testified that it was the most efficient gravity system that he had observed. Page 170. He had no doubt that it was in use to a much greater extent in small schoolhouses in Minnesota than any other system. Page 174.

The witness Sander, county superintendent of schools for Nicollet county, testified that there were 27 Smith plants installed in his county (page 183), and that they gave general satisfaction (page 191).

Complainants' witness Race had been a county superintendent of schools, and had examined heating and ventilating devices from the Gulf of Mexico north, and east to the Atlantic Ocean. Complain-

ants' Record, vol. 2, p. 111. He testified that the Smith apparatus was the best of the gravity systems. Page 112. When he was superintendent of schools of Redwood county, Minn., there were 46 of the Smith systems in his county (page 212), and he had examined and tested 20 or 30 of those (page 213) and found them very efficient (page 214). He stated that 26 structures made after his own ideas and installed in schools he had removed apparently for the purpose of installing the Smith system. Complainants' Record, vol. 2, p. 115.

The superintendent of schools of Lac Qui Parle county, Minn., testified that there were 35 Smith plants installed in his county, and that they worked splendidly. Complainants' Record, vol. 1, p. 302.

Miss Burce, superintendent of schools, Eau Claire county, Wis., said there were 17 of the Smith plants in use in her county, and that they worked satisfactorily. Complainants' Record, vol. 1, pp. 389, 390.

There is no evidence in the case to show that any one of the devices referred to in the prior patents has ever been a commercial success, and there is no evidence to show that any one of them was ever used. The fact that the defendants are not using any of these devices, which according to their expert produce the same or even better results than the Smith device, seems to indicate that the expert is possibly mistaken in his view. As was said in the case of Griswold v. Harker, 62 Fed. 393, 10 C. C. A. 439, by the Circuit Court of Appeals of this circuit:

"It is not impossible that the reason why the appellees are not using the old devices they plead is that the improvements described in this patent have made them useless and unmerchantable. If this is not so, they can abandon the improvements of Selden and Griswold, and go back to the devices they plead."

The conclusion therefore is that claims 5 and 6 are valid, and are not anticipated by any prior patent.

The remaining question is: Have the defendants infringed? As has been said, the patentee Smith has devoted himself to this business for seven years, and the Manuel-Smith Company has been engaged therein since 1905. They had practically no competition until 1907, when they came in competition with the defendants. Complainants' Record, pp. 57, 257. They had done a great deal of work in introducing the system into the schools of Minnesota and Wisconsin, and had spent $20,000 in advertising. Complainants' Record, p. 277.

The defendants went into partnership some time in October or November, 1906. Defendants' Record, p. 26. They commenced to manufacture in August, 1907. Defendants' Record, pp. 24, 30. Prior to that time they had no factory of their own. Defendants' Record, p. 28. Waterbury, prior to going into partnership with the other defendant, Waterman, had seen, as he admitted, one or two Smith devices, and had tested one of them in Wisconsin in 1906.

Exhibit 12 produced by the complainants was sold by the defendants to a school district at Alden in Wisconsin in 1907, and is claimed by the complainants to be identical with the structures sold by them, omitting the horizontal portion 7.

The grounds for defendants' claim of noninfringement are two. They say that there is no evidence to show the size of the chimney or main flue in the schoolhouse at Alden, and, consequently, it does not appear that the main flue and the auxiliary flue have substantially the same capacity as required by claim 5. Even if this were admitted, the defendants could not escape claim 6, for that makes no such requirements in regard to the capacity of the two flues. There was some evidence relating to the size of the flues used in Wisconsin, and as to the size that could be supported upon a bracket. (Defendants' Record, pp. 12, 13), and also some evidence as to the size of the flues required by the complainants (Complainants' Record, vol. 1, p. 194). There was also evidence that the defendants have been, and now are, selling devices similar to the blueprint in defendants' exhibit, and that they claim the right so to do.

Under the circumstances, it must be held that there is sufficient evidence of infringement, so far as this point is concerned.

The second ground relied upon by the defendants is to my mind much more serious.

The complainants' structure provides a damper at the lower end of the auxiliary flue. The defendants have moved this damper up to the junction of the vertical section of the auxiliary flue with its horizontal section, and have hinged it upon one side. It can be closed so as to entirely shut off the air from the auxiliary or cold air flue, but it cannot be closed so as to entirely shut off the smoke and hot air gases from the stove. When it is open to its full capacity, quite a portion of such gases pass through the horizontal section of the cold air flue. The defendants have a patent for this damper, No. 878,474, issued February 4, 1908.

The essence of the complainants' patent, as has been seen, is that the cold air currents and the hot air currents meet in the enlarged chamber, where they are thoroughly mixed. It differs from the former structures in that it does not admit of any stratification of the air and heat columns. The defendants claim that their damper produces the same result as is produced in the old devices by projecting the smoke-flue into the air chamber, and, consequently, that they make no use of the essential feature of the complainants' patent. See Carter's testimony, pp. 154, 165, 173, 240, 250, 265, 266, 268. Complainants' expert testified in reference to this matter on pages 222, 232, 381, vol. 2, Complainants' Record.

There seems to be considerable force in the defendants' claim, but it is apparent that the mixing chamber referred to in McInerney's testimony is not entirely destroyed by the action of the damper. The defendants make use of the enlarged part of the complainants' device, and into this enlarged part a portion of the air from the flue enters without being at all deflected. In fact, in the defendants' patent it is stated that the currents of air and the products of combustion mingle at the conjunction of the smoke-pipe with the foul air flue, and in claim 3 it is said that a portion of the air brought up by said foul air flue is returned to the heater, while the remaining portion is mingled with the product of combustion.

The defendants should not be allowed to evade a claim of infringement by saying that, while they make use of the idea of the complainants in part, they do not use it to its fullest extent.

So far as this patent is concerned, a decree must be entered in favor of the complainant for an injunction and an accounting.

I have reached this result without taking into account the tests made by the complainants of the six devices referred to in the prior patents, and it is not necessary to consider whether or not those tests were so made as to be of any value in determining the questions here at issue. While the complainants' expert testifies that his opinion has been confirmed by the result of those tests, yet I do not understand him to say that it is founded upon the tests. He had practically stated his opinion in his former examination, which was given before the tests were made.

The Second Patent to Smith, No. 868,299, October 15, 1907. The idea of deflecting a current of cold air upwards by an inclination of the intake pipe is disclosed in the patent to Skilton, No. 460,-684. See Fig. 7, where it is used in connection with a stove. The idea of deflecting it by a damper is shown in the patent to Scott, No. 585,708. The precise construction, however, shown by the patent in suit, namely, a cold air box closed at the bottom, combined with a jacket which is open at both ends, does not appear in any prior patent.

The law presumes that this patent is valid, and I am inclined to and do hold that it is so with reference to the precise construction therein, and that there is no anticipation by any prior patent.

Concerning the infringement, it appears that the defendant had been manufacturing systems with the complainants' device attached thereto prior to October 15, 1907, the date on which the patent was issued. Prior to that date they had sold one of their systems with this device thereon to a school district in the town of Alden, Wis., and this system was shipped, or a part of it, on the very day on which the patent was granted. The evidence of infringement does not, however, rest upon this one sale and shipment. The patent was issued on Tuesday, and the defendants did not hear of it until the following Sunday. They testified that they had on hand ready for shipment 15 or 20 systems in which this device appeared. Waterbury, Defendants' Record, p. 36. They were then shipping about 20 systems a day. Waterbury, p. 43. Waterman testified as to shipments after the patent was issued and before they learned of it, as follows (page 94): "I assume there may have been a very few."

The evidence is sufficient to show that the defendants, after the patent was granted, shipped and disposed of quite a number of systems containing the identical device described therein. Infringement is therefore made out.

The evidence shows that, after the defendants were informed of this patent to the complainants, they ceased selling and shipping systems containing their device, and substituted one of their own, for which they afterwards secured a patent dated November 10, 1908, and numbered 903,644.

It is not claimed by the complainants that the construction shown in Fig. 4 of this patent is an infringement of their patent. Complainants' Record, Smith, p. 6. They do claim, however, that the one in the other figures is an infringement.

The claims in the complainants' patent relied upon by them are 3, 4, 5, and 6, and each of them requires (1) a cold air intake, and (2) that the deflecting means be arranged within an air heating chamber. Complainants' Record, vol. 1, p. 145, McInerney.

These two elements, namely, the cold air intake and the heating chamber, are separate and distinct. Whether the device in defendants' patent and used by them infringes depends upon whether its damper or deflecting means is in the air heating chamber or in the intake pipe. If it is not in the air heating chamber, there is, in my opinion, no infringement. The evidence shows that no part of the deflecting means projects into the air heating chamber. Complainants' Record, vol. 2, p. 234, McInerney. It is very evident from an inspection of the drawings that this is true.

The theory of complainants (McInerney, vol. 1, p. 145; vol. 2, pp. 234, 235) that the intake pipe is an enlargement of the heating chamber cannot be sustained. McInerney apparently goes even further, and says that a mere damper in an ordinary cold air flue hinged at the bottom, and so arranged as not to project into the air heating chamber and to deflect the air upwards, would be an infringement. Volume 1, pp. 145, 146. The defendants do not infringe this second patent of the complainants by the device described in their patent No. 903,644, and now used by them.

Let a decree be entered for the complainants, with costs, that both of the patents described in the complaint are valid; that each one of them has been infringed by the defendants; ordering that an injunction issue perpetually restraining the defendants from using the device shown in the evidence and marked Exhibit 12 and directing that the case be referred to a master for an accounting. Let the decree also provide that the defendants do not infringe the second patent to Smith, No. 868,299, by the use of either of the devices described in their patent No. 903,644. If the parties cannot agree upon the terms of the decree, it will be settled by the court on notice.